66 A.3d 720

**PINES PLAZA LIMITED PARTNERSHIP**

v.

**BERKLEY TRACE, LLC, The Hampton Company, Inc., and James P. Joyce.**

**No. 30 Sept. Term 2012.**

Court of Appeals of Maryland.

May 21, 2013.

654

Steven M. Klepper (George E. Brown of Kramon & Graham, P.A., Baltimore, MD), on brief, for Petitioner.

Bruce F. Bright (Ayres, Jenkins, Gordy & Almand, P.A., Ocean City, MD), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

## McDONALD, J.

This case concerns the interpretation of a contract for the sale of real property. Much turns on the actions of a party no longer present and the significance of what was left unsaid in the contract and related documents.

The controversy arose out of a contract to sell a shopping center—a contract that was amended on several occasions. Among other things, the buyer agreed to indemnify the seller for a real estate commission, which they both disclaimed in the contract itself, that might ultimately be owed to a particular real estate broker. Another provision provided for forfeiture of the buyer's $200,000 deposit if the transaction did not close on the timetable in the contract. In order to raise funds for the purchase, the buyer recruited some investors to fund the deposit and most of the purchase price and assigned them interests in the contract.

Complications arose. The transaction ultimately closed after the appointed date. The real estate broker successfully sued the seller for a commission in the amount of $196,666.66. The buyer went bankrupt and dropped out of the picture, leaving the seller and the assignee investors to sort out the consequences of those events under the contract. They resorted to the courts, and it is now our task to interpret the contract and related documents in light of Maryland law.

■ Under Maryland common law, one who takes an assignment of an interest in a contract for the sale of real property does not assume the obligations of the assignor under the contract, unless the assignment explicitly provides so. The seller in this case invites us to reverse that presumption and hold that an assignee normally assumes the obligations of the assignor under the contract, unless the assignment provides otherwise. We decline to do so. Accordingly, the seller here is not entitled to indemnification from the assignee investors for its liability for the broker's commission, even though the buyer (their assignor) is obligated to indemnify the seller.

■   Under Maryland common law, failure to meet a deadline for the settlement of a contract for the sale of real property is not a breach that triggers forfeiture of the buyer's deposit if the transaction closes within a reasonable time of the stated date, unless the contract clearly provides otherwise. The seller in this case asserts that this particular contract allows no deviation from the stated deadline. We disagree. The contract language itself suggests that the normal rule applies. And the seller proceeded to complete the settlement without declaring a default. Accordingly, the seller is not entitled to forfeit the deposit funded by the investors.

■   Finally, the seller seeks to have the investors' claim for refund of the $200,000 deposit offset by the amount of indemnification ($196,666.66) that their assignor, the buyer, owes the seller. In this regard, the seller's position has merit. An assignee, such as the investors here, who asserts a claim based on the assignment of a contract right is subject to an offsetting claim that the seller would have against their assignor arising from the same transaction. This concept, known as recoupment, applies even if the seller could not, as in this case, affirmatively assert that claim against the assignee.

Thus, the end result is, more or less, a draw.

## Background

*1998–2002: Pines Plaza seeks a buyer for its shopping center*

Beginning in January 1998, Pines Plaza Limited Partnership ("Pines Plaza"), the Petitioner in this case, sought to sell a shopping center it owned ("the property") in the Ocean Pines community of Worcester County. Toward that end, Pines Plaza entered into an exclusive listing agreement with Crimmins Associates Real Estate ("Crimmins Associates"), a real estate brokerage firm. The listing agreement remained in effect for the next four years, but the property was not sold.

In early 2002 new owners took control of Crimmins Associates; Pines Plaza informed Crimmins Associates that it had decided not to renew its listings with the firm, including the unsold shopping center. Nevertheless, in a letter dated

March 23, 2002, a representative of Pines Plaza informed Crimmins Associates that "if you do get a real buyer and a contract, [Pines Plaza] will accept it under the same terms and conditions of the original listing."

*June 2002: Crimmins Associates finds a buyer—Q-C*

In June 2002, Crimmins Associates informed Pines Plaza that a potential buyer had been found. James Quillen [1] and Eric Chadwick proposed to purchase the property through a new venture, Q-C Pines Plaza, LLC ("Q-C"). The initial proposal fell through. But Mr. Quillen and Mr. Chadwick again expressed an interest in buying the property. This offer was apparently more attractive to Pines Plaza. In February 2003, Pines Plaza entered into a contract to sell the property to Q-C.

*2003: The Contract, its First Amendment, and its Second Amendment, without a closing*

The contract stated a purchase price of $6 million, required a deposit of $10,000, and set the deadline for closing as April 15, 2003. The contract contained a provision in which Pines Plaza and Q-C both "represent[ed] and warrant[ed]" that no broker, other than one of the principals of Pines Plaza and the firm that represented Q-C, was entitled to a commission in connection with the transaction. Nevertheless, the contract also included an indemnification provision that "Purchaser shall indemnify and hold harmless from and against any claim for a broker's fee, commission, finder's fee or similar fee from Crimmins Associates...." There apparently had been a discussion between Pines Plaza and Q-C, not memorialized in the contract, as to whether Crimmins Associates was due any fee. According to testimony by the principal of Pines Plaza, he insisted on the indemnification provision, even though Mr.

---

1. Mr. Quillen was an attorney involved in numerous real estate transactions. After this transaction, but before this litigation arose, he went bankrupt and was also disbarred by this Court. *Attorney Grievance Commission v. Quillen*, 401 Md. 167, 931 A.2d 1092 (2007); *In re Quillen*, 408 B.R. 601 (Bankr.D.Md.2009), *aff'd sub nom. Quillen v. Guttman*, 2010 WL 1416122 (D.Md.2010).

Quillen said that he had already resolved the issue by paying $19,000 to Crimmins Associates as a finder's fee.

Shortly thereafter, an unforeseen issue emerged, and Pines Plaza terminated the contract within the contract's rescission period prior to payment of the $10,000 deposit.[2] To revive the deal, Mr. Quillen, one of the principals of Q–C, then drafted and faxed to Pines Plaza a "First Amendment to Contract of Sale" (the "First Amendment") that provided for, among other things, the reinstatement of the contract, payment of the non-refundable $10,000 deposit by Q–C, and a new closing deadline of June 30, 2003.[3] The parties executed the First Amendment effective April 1, 2003, but the sale did not close on the appointed day.

Yet again Mr. Quillen returned to Pines Plaza and sought to revive the sale. Pines Plaza and Q–C entered into a "Second Amendment of Contract of Sale" (the "Second Amendment") which the parties executed on January 5, 2004. The Second Amendment provided that Q–C's deposit of $10,000 was forfeited and would not be applied to the sale price. Further, the Second Amendment required an additional $200,000 deposit by Q–C, which would be applied against the purchase price at closing, and specified a new deadline for the closing date as January 12, 2004. It also provided that the $200,000 deposit could be retained by Pines Plaza as "liquidated damages" if the closing did not occur as agreed.

*January 2004: Berkley Investors agree to fund the deposit and part of the purchase price*

To raise funds needed for the deposit and purchase price, Q–C recruited three additional investors: Berkley Trace, LLC; The Hampton Company, Inc.; and James P. Joyce (collectively, the "Berkley Investors"), the Respondents in this

---

**2.** Pines Plaza terminated the contract by letter dated February 26, 2003, after it was notified by its lender of a prepayment penalty that it had not anticipated.

**3.** In the First Amendment, the parties also agreed to an allocation between them of the pre-payment penalty owed to Pines Plaza's lender. See note 2, above.

case.[4]    On January 9, 2004, Q–C assigned each of the three Berkley Investors a 25 percent tenant-in-common interest "in and to the Contract for the shopping center. . . ." The written assignments also made reference to both the First Amendment and the Second Amendment.  While the assignments recited in boilerplate language that they were provided in consideration of "mutual covenants" and other consideration, they did not identify the consideration provided by the Berkley Investors.[5]    Nor did they state that the Berkley Investors were undertaking Q–C's obligations under the contract.  Between January 7 and January 15, the Berkley Investors funded the $200,000 deposit required by the Second Amendment of the contract and paid $3.1 million toward the $6 million purchase price by wiring funds to the settlement agent. Pines Plaza was aware of the assignments to the Berkley Investors, at least by the scheduled closing date of January 12, 2004.

*January 12, 2004: Execution of closing documents*

On January 12, 2004, Pines Plaza and Q–C executed closing documents, including a deed.  Three days later, the settlement agent transferred $3.1 million to Pines Plaza's agent.  Settlement, however, did not conclude on that date as Q–C failed to provide the remainder of the purchase price.[6]    According to

---

**4.**  The Berkley Investors were experienced in real estate investment and development.  For example, Mr. Joyce was the former president of the Baltimore division of Ryland Homes.  Mr. Quillen was a friend and business adviser of the principals of Berkley Trace, LLC, and The Hampton Company, Inc., who testified that they relied on his advice to participate in the deal, without reviewing many of the documents.

**5.**  Two of the assignments made reference to a "1031 exchange" by the assignees, which implied that the assignees would be providing funds derived from another real estate transaction.  The number "1031" refers to a section of the Internal Revenue Code (26 U.S.C. § 1031), under which a taxpayer may defer recognition of a capital gain or loss, and related taxes, upon the disposition of property held for investment or for use in a trade or business when it is exchanged for a property of "like kind."

**6.**  A further complication was that Pines Plaza's mortgage lender was entitled to 30 days notice of an intended pay-off.

the Berkley Investors, however, one of the principals of Q–C, Mr. Quillen, advised that the deal had in fact closed on January 15, but that they would have to obtain additional funds from another bank to complete the financing.[7]

*January 29, 2004: A Third Amendment without the Berkley Investors; settlement*

Unbeknownst to the Berkley Investors, two weeks after execution of closing documents, on January 29, 2004, Mr. Quillen prepared a "Third Amendment of Contract of Sale" (the "Third Amendment") between Pines Plaza and Q–C. The Third Amendment was executed by the president of Pines Plaza and by Mr. Quillen on behalf of Q–C. The Third Amendment acknowledged that closing documents had been executed two weeks earlier, but declared that event a "nullity," stated that the $200,000 deposit had been forfeited, and set a new closing date of March 1, 2004. The Third Amendment also provided for forfeiture, as liquidated damages, of the $3.1 million paid by the Berkley Investors if closing did not occur on that date. The Berkley Investors did not participate in the negotiations or execute the Third Amendment.

The sale ultimately settled on March 1, 2004. Documents executed on January 12, 2004 were included and re-dated as of March 1, 2004. The $200,000 deposit was not credited against the purchase price. No payment was made to Crimmins Associates as a commission with respect to the sale.

*2005: Crimmins Associates sues Pines Plaza; Judgment for Crimmins Associates*

In 2005, the principals of Crimmins Associates filed a lawsuit in the Circuit Court for Worcester County against Pines Plaza. That suit sought damages from Pines Plaza for failure to pay a commission on the sale of the property. Pines Plaza filed a third-party claim, seeking indemnification from Q–C

---

**7.** Apparently Pines Plaza and the Berkley Investors had been led to believe that the purchaser of the property would temporarily assume an existing mortgage of Pines Plaza at closing. However, it later developed that the purchasers had to re-finance the property without assuming the existing mortgage.

and the Berkley Investors. In February 2008, the Circuit Court entered judgment against Pines Plaza in the amount of $200,000, an amount later reduced by agreement to $196,666.66. Pines Plaza's third-party claim was dismissed without prejudice. Pines Plaza satisfied the judgment in late July 2008.

*2008–2010: Pines Plaza seeks indemnification from Q–C and Berkley Investors*

In September 2008, Pines Plaza filed suit against Q–C and the Berkley Investors renewing its claim for payment under the indemnification provision of the contract with respect to the judgment in favor of Crimmins Associates. Q–C did not offer a defense, and a default judgment was ultimately awarded against it in the amount of $196,666.66.[8] The Berkley Investors actively defended the law suit, however, and filed a counterclaim against Pines Plaza seeking recovery of the $200,000 deposit, which had not been credited against the purchase price.

A bench trial was held on March 29, 2010. The Circuit Court ruled in favor of the Berkley Investors on both the claim and the counterclaim. It concluded that, while Q–C had agreed in the contract to indemnify Pines Plaza for any real estate commission owed to Crimmins Associates, the Berkley Investors had not assumed that obligation when Q–C assigned them interests in the contract. The Circuit Court also concluded that, in proceeding to settlement in March 2004 instead of terminating the contract, Pines Plaza had opted to disregard the failure to complete the closing by the January deadline; accordingly, it was not entitled to forfeiture of the Berkley Investors' $200,000 deposit as "liquidated damages" under the Second Amendment. The court also concluded that the Third Amendment, which purported to recognize the forfeiture of that sum, was not binding on the Berkley Inves-

---

**8.** By that time, Mr. Quillen had filed for bankruptcy and Q–C no longer had an interest in the property. In 2006, Q–C had conveyed its remaining 25% interest in the property to the Berkley Investors for no consideration in a "Corrective Deed without Warranties."

tors, as they were not privy to that agreement between Pines Plaza and Q–C. The Circuit Court granted judgment in favor of the Berkley Investors in the amount of $200,000.00.

*Appeal of judgment in favor of Berkley Investors*

Pines Plaza appealed to the Court of Special Appeals. That court affirmed the judgment of the Circuit Court in an unreported decision. We granted Pines Plaza's petition for a writ of certiorari.

## Standard of Review

We review factual determinations of the Circuit Court for clear error in the light most favorable to the prevailing party—here the Berkley Investors. *City of Bowie v. MIE Props., Inc.*, 398 Md. 657, 676, 922 A.2d 509 (2007). We review the decision of legal questions, including the interpretation of the contract, its amendments, and the assignments, without according any special deference to the Circuit Court or the Court of Special Appeals. *Id.* at 677, 922 A.2d 509.

## Discussion

Pines Plaza has presented three issues for our review. First, it argues that the lower courts should have ruled that it was entitled to indemnification of the $196,666.66 commission it paid to Crimmins Associates because the assignment of interests in the contract to the Berkley Investors necessarily also delegated to them Q–C's obligation to indemnify Pines Plaza for any commission paid to Crimmins Associates.

Second, with respect to the Berkley Investors' counterclaim, Pines Plaza contends that it was entitled to retain the $200,000 deposit, without crediting it to the purchase price, because the deposit was forfeited to it under the Second Amendment when the transaction was not completed by January 12, 2004—the deadline for closing in the Second Amendment.[9]

---

9. In the lower courts, Pines Plaza also argued that the Berkley Investors were bound by the Third Amendment, which purported to confirm

Finally, Pines Plaza asserts that, even if we affirm the lower courts' rulings against it on the first two issues, it is entitled to a set-off (or more precisely, recoupment) against its liability for the $200,000 deposit. In particular, it argues that, even if it is only entitled to indemnification from Q–C (and not from Q–C's assignees—the Berkley Investors) for the Crimmins Associates judgment, any claim by the Berkley Investors against Pines Plaza for the $200,000 deposit is subject to the defenses that Pines Plaza would have against the Berkley Investors' assignor—Q–C. Accordingly, Pines Plaza reasons, it is entitled to offset the amount of its indemnification claim against Q–C of $196,666.66 against its liability to the Berkley Investors, even if it is not entitled to sue the Berkley Investors directly for that amount.

### Whether the assignments obligated the Berkley Investors to indemnify Pines Plaza

■ Under the original contract, Q–C was required to indemnify Pines Plaza for any real estate commission that Pines Plaza might owe to Crimmins Associates—a provision unaltered by any of the subsequent amendments.[10] Pines Plaza argues that Q–C's assignment of interests in that contract to the Berkley Investors necessarily included the indemnification obligation. Under that theory, the entry of a judgment against Pines Plaza in favor of Crimmins Associates for a commission in the amount of $196,666.66 triggered a require-

---

forfeiture of the $200,000 deposit. Both the Circuit Court and the Court of Special Appeals held that the Berkley Investors were not bound by the Third Amendment that Pines Plaza and Q–C had executed without their knowledge or participation. In this Court, Pines Plaza no longer relies on the Third Amendment as support for its forfeiture argument.

10. Based on testimony at trial, the Circuit Court found that the recitation in the contract that Pines Plaza and Q–C denied knowledge that Crimmins Associates could claim a commission was "patently false" and misleading. It also found that, in the context of the dealings between those two parties, the provision represented that, in any event, Q–C would take care of any commission that might be claimed by Crimmins Associates.

ment that the Berkley Investors pay a like amount to Pines Plaza.

The assignments by Q–C to the Berkley Investors are silent as to whether they also delegate Q–C's obligations under the contract.[11] Thus, we consider whether, in an assignment of a contract for the sale of real property, there is a presumptive delegation and assumption of the assignor's obligations.

Maryland law has traditionally followed the rule that assignment of a real estate contract is presumed *not* to include an assumption or delegation of the assignor's obligations under the contract. In 1929, this Court stated:

> It is true that the covenant for payment of the purchase price of land does not follow the land into the hands of an assignee of the vendee, so that he would be under a liability to his vendor's vendor, merely by virtue of his having bought the property. The authorities hold, "that a liability of this kind can result only from some express or implied contract of the assignee, and that it will not be implied from the mere assignment of the original contract even though followed by possession of the land."

*East Vedado Corp. v. E.S. Adkins & Co.*, 157 Md. 416, 418–19, 146 A. 385 (1929) (internal citation omitted). For purposes of clarity and brevity, we will refer to this rule as a "non-delegation presumption." Although the statement in *East Vedado* was dicta—in that case, the assignment had clearly provided that the assignee assumed certain duties under the contract—Maryland courts have reiterated the non-delegation presumption to decide subsequent cases. *See Pumphrey v. Kehoe*, 261 Md. 496, 506–07, 276 A.2d 194 (1971); *Petals Factory Outlet, Inc. v. EWH & Assoc.*, 90 Md.App. 312, 318–19, 600 A.2d 1170 (1992); *P/T Ltd. II v. Friendly Mobile Manor*, 79 Md.App. 227, 238, 556 A.2d 694 (1989).

---

11. The assignments each recite that Q–C was assigning a "tenant in common interest" to the assignee. To the extent we can glean anything from the language of the assignment, it appears to describe an interest in real property that is the subject of the contract without reference to the various obligations undertaken by Q–C in the original contract.

A different presumption—that an assignment of a contract ordinarily includes an assumption of the assignor's duties, which we will refer to as a "delegation presumption"—prevails in certain other areas of Maryland contract law that do not involve real estate transactions. For example, the Maryland Uniform Commercial Code ("Maryland UCC") adopts the delegation presumption for contracts involving the sale of goods. *See* Maryland Code, Commercial Law Article ("CL"), § 2–210(5).[12]

Pines Plaza argues that the Legislature similarly adopted the delegation presumption when it recodified statutes concerning real property in the Real Property Article ("RP") of the Maryland Code. In particular, it points to the following language:

> Unless otherwise expressly provided, any obligation imposed or right granted to any person is automatically binding on or inures to the benefit of his assigns, successors, heirs, legatees, and personal representative. However this section is not to be construed to create or confer any rights of assignment where none would exist otherwise.

RP § 1–103. According to Pines Plaza, this provision essentially extends the delegation presumption that appears in the Maryland UCC to assignments of real property contracts, such as Q–C's assignments to the Berkley Investors.

While the language of RP § 1–103, taken out of context, may superficially appear to embrace a delegation presumption

---

12. That provision states as follows:

§ 2–210. Delegation of performance; assignment of rights.

\*　　\*　　\*

(5) An assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances (as in an assignment for security) indicate the contrary, it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract.

\*　　\*　　\*

CL § 2–210(5).

for assignments of real estate contracts, the function of that statute is quite different when considered in context. RP § 1–103 appears in the first subtitle of the Real Property Article, which contains definitions and other general provisions concerning the interpretation of the Real Property Article itself.[13] Rules of construction relating to the interpretation of deeds, instruments, real estate contracts, and other instruments appear in other parts of the Real Property Article. *See, e.g.,* Maryland Code, Real Property Article, Title 2 (entitled "Rules of Construction").

Although the purpose and application of RP § 1–103 appears clear from its context, the contemporary explanation of those who drafted it leaves no doubt. As the Court of Special Appeals observed, the predecessor of RP § 1–103 was originally enacted in 1972 as § 1–104 of Article 21 of the Maryland Code. Chapter 349, § 1, Laws of Maryland 1972. It was recodified without substantive change in its current form when the Real Property Article was adopted in 1974 and has remained unchanged over the last four decades. *See* Chapter 12, § 2, Laws of Maryland 1974.

The occasion for the creation of this provision was a recodification project of real property statutes undertaken by the Code Revision Committee of the Section of Real Property, Planning and Zoning Law of the Maryland State Bar Association. When the Legislature adopted the recodification in 1972, that committee provided commentary that explained the purpose of various provisions and that was reprinted in the Annotated Code of Maryland. With respect to this provision, the commentary stated:

[RP § 1–103] is a useful provision intended to eliminate useless verbiage from the statute. In some instances, language such as "personal representatives, heirs, and assigns" has been retained in the statute, but no inference beyond

---

**13.** The other sections in Title 1 define the terms used in throughout the Article (RP § 1–101), provide that factual presumptions stated in the Article are generally rebuttable (RP § 1–102), and indicate the extent to which parties may vary rules created by the Article (RP § 1–104).

the scope of [RP § 1–103] is to be drawn from such retention except where otherwise stated.

Maryland Code, Article 21, Comment to Title 1 (1966 Repl. Vol., 1972 Interim Supp.). To the extent that RP § 1–103 provides for obligations imposed on a person to be binding on a person's "assigns," it is referring to obligations imposed elsewhere in the Real Property Article, not obligations imposed by private contract.

▇ Thus, we agree with the Court of Special Appeals that RP § 1–103 was intended to apply to and govern the interpretation and effect of other provisions within the Real Property Article and that it was not intended as a general statement of law governing private contractual agreements, indemnification agreements, or claims arising out of real estate transactions.

Apart from its interpretation of RP § 1–103, Pines Plaza seeks to have us adopt, as part of our common law, a delegation presumption in place of the non-delegation presumption previously applied by Maryland courts to assignments of real estate contracts. But there appears to be no consensus among courts in other jurisdictions that might influence us to abandon the rule consistently applied in earlier Maryland cases.

For example, while summarizing general principles of contract law, the Restatement 2d of Contracts adopts a delegation presumption. *See* Restatement 2d of Contracts § 328.[14] But

---

**14.** That section provides:

(1) Unless the language or the circumstances indicate the contrary, as in an assignment for security, an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

(2) Unless the language or the circumstances indicate the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties and the obligor of the assigned rights is an intended beneficiary of the promise.

*Caveat: The Institute expresses no opinion as to whether the rule stated in Subsection (2) applies to an assignment by a purchaser of his rights under a contract for the sale of land.*

the drafters of the Restatement qualify that provision to state that they "express no opinion" on whether the delegation presumption applies to a contract for the sale of land, given prior court decisions adopting the non-delegation presumption for such contracts. *See Id., caveat & comment c.* In the commentary to § 328, the editors noted that conflicting precedent prevented them from declaring a general rule as to whether an assignee of a real estate contract assumes the obligations of the assignor.[15]

The non-delegation presumption is merely a default rule of contract interpretation, and a clear expression of contrary intent by the parties to the assignment—the assignor and assignee—will control. The delegation presumption that appears in the Maryland UCC similarly may be overridden by the parties. CL § 1–302; *Etelson v. Suburban Trust Co.,* 263 Md. 376, 379, 283 A.2d 408 (1971) ("The UCC recognizes that there may be times where parties to an instrument may choose to alter the general provisions of the UCC to meet their particular purposes."). As we can find no compelling reason in this case to reverse the existing presumption under Maryland common law with respect to contracts for the sale of real property, we decline to do so.[16]

Finally, Pines Plaza argues that a provision of its original contract with Q–C that included assignees within the definition of "Purchaser" overrides the non-delegation presumption.

---

Restatement 2d of Contracts § 328.

**15.** *See, e.g., Langel v. Betz,* 250 N.Y. 159, 164 N.E. 890 (1928) (applying non-delegation presumption in interpreting assignment of a real estate contract); *see also Hudson Eng'g Assocs., P.C. v. Ames Dev. Corp.,* 228 A.D.2d 477, 643 N.Y.S.2d 677 (1996) (same); *Davey v. Nessan,* 252 Mont. 397, 830 P.2d 92, 96 (1992) (same); *but see DeVenney v. Hill,* 918 So.2d 106 (Ala.2005) (applying delegation presumption); *Kunzman v. Thorsen,* 303 Or. 600, 740 P.2d 754, 759 (1987) (same); *Coral Gables, Inc. v. Kleaveland,* 220 Iowa 1280, 263 N.W. 339, 342–43 (1935) (same).

**16.** We do not suggest that the existing presumption is necessarily the better default rule for real property transactions. The Legislature, which may provide a forum for the airing of competing policy arguments as to the better default rule, has the power to reverse the presumption.

This seems dubious as the introductory paragraph of the contract identifies Q–C alone as the "Purchaser" and the later provision that includes assignees within the definition of "Purchaser" does so in the context of an "effective assignment" of "rights under this contract" pursuant to the conditions of that provision.[17] Even if the original contract between Pines Plaza and Q–C required Q–C to include a delegation of its obligations in any assignment of its rights under the contract, its failure to comply with such a provision is solely a breach of its contract between Pines Plaza and Q–C—a quite separate issue from whether Q–C's assignments themselves obligated the Berkley Investors to indemnify Pines Plaza.

We therefore conclude that the assignments, which were themselves silent on delegation of Q–C's contract obligations, did not implicitly delegate to the Berkley Investors the obligation to indemnify Pines Plaza for payment of a real estate commission to Crimmins Associates.

*Whether Pines Plaza is entitled to forfeiture of the $200, 000 deposit as liquidated damages*

■ Pines Plaza also seeks to overturn the Circuit Court's judgment in favor of the Berkley Investors' on their counterclaim against Pines Plaza for the return of the $200,000 deposit that was never credited to the sale price. Pines Plaza argues that the Second Amendment provided for forfeiture of

---

**17.** That provision states:

§ 16.01. Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of Seller which may be withheld in the sole discretion of Seller. No permitted assignment of Purchaser's rights under this Contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment. Purchaser shall cooperate with Seller in the facilitation of a Section 1031 Exchange by Seller. Purchaser shall consent to the assignment of this Contract to a Qualified Intermediary acting on Seller's behalf to facilitate a Section 1031 Exchange. Purchaser shall execute, acknowledge or deliver any other documents reasonably requested by Seller to complete in Section 1031 Exchange.

the $200,000 deposit if the closing did not occur by the deadline set forth in the Second Amendment—January 12, 2004.[18] As the settlement was not completed until March 1, 2004, Pines Plaza asserts that it was entitled to consider the $200,000 deposit forfeited under the Second Amendment and was not obligated to credit the deposit against the purchase price.

Pines Plaza bases its argument on a provision in the Second Amendment, which reads as follows:

*Additional Deposit.* Within two (2) business days from the full execution of this Second Amendment, Purchaser shall deposit with Seller the sum of Two Hundred Thousand Dollars ($200,000) (the "Additional Deposit"). The Additional Deposit shall be applied against the Purchase Price at Closing. If Closing does not occur on or before the Closing Date, Seller shall retain the Additional Deposit as liquidated damages. The initial deposit by Purchaser of $10,000 is hereby forfeited by Purchaser to Seller and such initial deposit shall not be applied against the Purchase Price at Closing.

Second Amendment, ¶ 2. Forfeiture of the "additional deposit" of $200,000 thus depended on whether the "Closing" occurred on or before the "Closing Date."

---

**18.** Pines Plaza asserts that the Second Amendment made January 12, 2004, a strict deadline for closing and subjected the $200,000 deposit to automatic forfeiture if the deal failed to close by that date. It cites *Stern v. Shapiro,* 138 Md. 615, 627–28, 114 A. 587 (1921), for the proposition that a contract for the sale of real property may provide for forfeiture of a buyer's deposit upon failure to close by the stated date even if the contract does not include the stock phrase "time is of the essence." Yet that is simply one of many cases in which this Court has reiterated the general rule that "time is not of the essence of the contract of sale and purchase of land unless a contrary purpose is disclosed by its terms or is indicated by the circumstances and object of its execution and the conduct of the parties.... Ordinarily ... time is held to be of the essence only when it is clear that the parties have expressly so stipulated or their intention is inferable from the circumstances of the transaction, the conduct of the parties or the purpose for which the sale was made." *Kasten Construction Co. v. Maple Ridge Construction Co.,* 245 Md. 373, 377, 226 A.2d 341 (1967) (citing *Stern v. Shapiro,* among many other cases).

The terms "Closing" and "Closing Date" were defined in § 3.01 of the original contract, which originally read as follows:

> § 3.01. Except as otherwise provided in this Contract, the closing of title pursuant hereto (the "Closing") shall occur on or before April 15, 2003 at the offices of Residential Title and Escrow or such other mutually agreeable time and place (the actual date of the Closing herein referred to as "Closing Date").

The First Amendment modified this provision by simply replacing "April 15, 2003" with "June 20, 2003." No change was made to any other language of the provision. First Amendment, ¶ 4. The Second Amendment subsequently replaced "June 30, 2003" with "January 12, 2004" and similarly made no other changes to the provision. Second Amendment, ¶ 1. As amended, then, the contract specified the closing date as follows:

> § 3.01. Except as otherwise provided in this Contract, the closing of title pursuant hereto (the "Closing") shall occur on or before January 12, 2004 at the offices of Residential Title and Escrow *or such other mutually agreeable time and place* (the actual date of the Closing herein referred to as "Closing Date").

(emphasis added). The contract, as amended by the Second Amendment, thus set a target deadline of January 12, 2004, but allowed for an "other mutually agreeable time" for the closing.

The Circuit Court found that, for a variety of reasons, some of which were attributable to Pines Plaza, the parties conducted a "dry settlement" on January 12, 2004—*i.e,* the documentation was largely completed without the final disbursement of funds.[19] Thereafter, they cooperated in completing the trans-

---

19. A "dry closing" or "dry settlement" generally refers to a closing of a real estate transaction in which all or most of the closing requirements are fulfilled except for the disbursement of funds and delivery of documents. Completion of the settlement often awaits the funding of a

action by March 1, 2004. Even if one were to conclude that March 1 was the date most appropriately considered the date on which the transaction closed, it appears to fall within the contract's definition of "closing date" as another time agreed upon by the parties.

■ In any event, "[t]he accepted doctrine is that in the ordinary case of contract for the sale of land, even though a certain period of time is stipulated for its consummation, equity treats the provision as formal rather than essential, and permits the purchaser who has suffered the period to elapse to make payment after the prescribed date, and to compel performance by the vendor notwithstanding the delay.... The doctrine is subject to qualifications, one of the most important of which is that the delay must not be willful and must not have worked any harm to the vendor." *Soehnlein v. Pumphrey,* 183 Md. 334, 338, 37 A.2d 843 (1944); *see also Stefanowicz Corp. v. Harris,* 36 Md.App. 136, 144, 373 A.2d 54 (1977).

Moreover, as the Circuit Court observed, the contract—in another provision not itself altered by the subsequent amendments—provided that Pines Plaza had the option, in the event of a default by the purchaser of the property, to (1) disregard the default and proceed with the transaction or (2) terminate the transaction and forfeit the deposit.[20] In the context of a

---

loan or other means to finance the transaction. *See* D.L. Evans & O.W. Evans, *The Complete Real Estate Encyclopedia* (2007) at 139.

**20.** That provision read as follows:

12.01 Purchaser's Default. In the event Purchaser defaults in any of the terms, provision[s], agreements or covenants to be performed by Purchaser pursuant to this Contract, Seller may elect to (i) disregard such default and proceed to Closing, or (ii) terminate this Contract and the Deposit shall be forfeited by Purchaser, paid over to Seller by Escrow Agent, and retained by Seller as fixed, agreed and liquidated damages and Purchaser shall thereby be released and discharged from all liability and obligation accruing hereunder. A default by Purchaser shall occur only if Purchaser breaches any term, provision, agreement or covenant herein set forth to be performed by Purchaser and Purchaser fails to cure such breach within thirty (30)

possible forfeiture for failure to meet a closing deadline—a deadline that is ordinarily, and specifically in the contract between Pines Plaza and Q–C, subject to modification by mutual agreement—a provision requiring a party to declare a default obviously helps distinguish circumstances in which the parties have mutually agreed to extend the closing from those in which they have not. The Circuit Court found that there was "no evidence" that Pines Plaza declared a default—a finding that is not clearly erroneous.[21] Thus, even if there was a default by Q–C or the Berkley Investors, Pines Plaza's decision to proceed with the settlement effectively was an election under the contract to disregard that default. Accordingly, we agree with the Circuit Court and the Court of Special Appeals that the $200,000 deposit was not forfeited by the Berkley Investors.

### *Whether Pines Plaza is entitled to recoupment*

Pines Plaza further argues that it should be permitted to offset the amount of its indemnification claim against Q–C (the $196,666.66 that it paid to Crimmins Associates for a commission) against the $200,000 judgment entered against it in favor of the Berkley Investors, which was based on their rights as assignees of Q–C's rights under the contract. It asserts that it is entitled to such an offset even if we hold—as we have—that it may not affirmatively seek indemnification for the real estate commission from the Berkley Investors. The parties have variously referred to this argument as one for set-off or recoupment. Under the definitions adopted in a prior case, recoupment is the more appropriate term, as the

---

days following written notice to Purchaser from Seller that such breach has occurred and the nature thereof.

**21.** The Third Amendment may have been, as the Circuit Court suggested, an attempt by Pines Plaza to "have it both ways"—to set a new settlement date as well as to forfeit the deposit. In any event, the lower courts found that the Third Amendment could not be enforced against the Berkley Investors and Pines Plaza has abandoned reliance on it in this Court. See note 9 above.

liabilities to be offset against one another arise out of the same transaction.[22]

Pines Plaza asserted a defense of "setoff and recoupment" in its answer to the Berkley Investors' counterclaim, but did not elaborate on this argument in the Circuit Court. Although the defense was argued briefly in Pines Plaza's brief in the intermediate appellate court, the Court of Special Appeals did not explicitly address it.

The judgment in favor of the Berkley Investors is based on the $200,000 deposit that, under the Second Amendment, Q–C agreed to pay and Pines Plaza agreed to credit to the purchase price in a timely closing. As indicated above, the Berkley Investors did not assume Q–C's obligations to Pines Plaza as part of the assignments to them of interests in the contract. Accordingly, although they funded the deposit, they were not obligated to do so, but were providing funds for Q–C to fulfill one of its obligations under the contract. The Berkley Investors' entitlement to return of the deposit that was not credited to the purchase price is thus based on their status as assignees of Q–C's rights under the contract. In asserting Q–C's rights under the contract against Pines Plaza, the Berkley Investors are subject to any defenses that Pines Plaza would have against Q–C with respect to those rights. *Cf.* CL § 9–404. Pines Plaza would be entitled to offset any liability to Q–C for the uncredited deposit with Q–C's liability to it for indemnification of the broker's commission as a matter of recoupment.[23] It is therefore entitled to offset its liability to

---

22. A "recoupment" is "a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based" whereas a "setoff" means "a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of a transaction other than that on which the adversary's claim is based." *Imbesi v. Carpenter Realty Corp.*, 357 Md. 375, 380, 744 A.2d 549 (2000); *see also Beka Industries, Inc. v. Worcester County Board of Education*, 419 Md. 194, 227–31, 18 A.3d 890 (2011).

23. This offset depends, of course, on whether Pines Plaza's judgment against Q–C remains unsatisfied.

the Berkley Investors by that same amount, also as a matter of recoupment.[24] This is true, even though Pines Plaza could not affirmatively seek to collect its indemnification judgment against Q–C from the Berkley Investors. *Cf. Rittenberg v. Donohoe Construction Co.,* 426 A.2d 338, 341–42 (D.C.1981) (construing obligations and liabilities of an assignee under Maryland law).[25]

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID TWO-THIRDS BY THE PETITIONER AND ONE-THIRD BY RESPONDENT.

---

**24.** The Berkley Investors would thus satisfy Q–C's debt for the real estate commission. Whether they are thereby subrogated to Pines Plaza's claim against Q–C and, perhaps more critically, whether they can collect, is a question for another day.

**25.** The District of Columbia courts follow Maryland common law in the absence of local precedent. *Newby v. United States,* 797 A.2d 1233, 1242 & n. 13 (D.C.2002).